**In the Matter of MINNESOTA POWER'S TRANSFER OF M.L. HIBBARD UNITS 3 AND 4 BOILERS AND RELATED FACILITIES TO THE CITY OF DULUTH.**

No. C3–86–1186.

Court of Appeals of Minnesota.

Jan. 13, 1987.

Glenn E. Purdue, Minneapolis, and Reamy Ancarrow, Washington D.C., for M.A. Hanna Co.

Hubert H. Humphrey, III, State Atty. Gen., Karl Sonneman, Allen E. Giles, Sp. Asst. Attys. Gen., St. Paul, for MN Public Utilities Commission.

R. Scott Davies, Briggs & Morgan, Minneapolis, for Minnesota Power.

Robert S. Lee, Minneapolis, for Pickands Mather Company.

James D. Larson, Minneapolis, for Superwood Corporation.

Heard, considered and decided by HUSPENI, P.J., and SEDGWICK and LANSING, JJ.

## OPINION

SEDGWICK, Judge.

This appeal is from a state agency's decision not to reduce a public utility's rates upon approving the transfer of certain property by the utility. We affirm.

## FACTS

On March 14, 1986, Minnesota Power petitioned the Minnesota Public Utilities Commission ("the PUC" or "the Commission") for permission to transfer its M.L. Hibbard Units 3 and 4 boilers and associated equipment to the City of Duluth. Minn. Stat. § 216B.50 (1984) requires public utilities such as Minnesota Power to seek approval from the PUC before selling certain property, and it requires the PUC to investigate the application, with or without public hearing, and grant its approval if it finds the proposal to be in "the public interest."

The proposed transfer is part of a larger agreement under which Minnesota Power will donate the property to Duluth, which will modify it to burn cheaper fuel. The modified boilers will provide steam to commercial customers, including a company partly owned by Minnesota Power. Minnesota Power will maintain and operate the boilers under contract with Duluth.

The PUC solicited written and oral comments from M.A. Hanna Company ("Hanna") and other ratepayers. Hanna is a large volume purchaser of electric power from Minnesota Power. Hanna did not oppose the transfer, but it argued that since the property would no longer be "used and useful," approval should be accompanied by an immediate removal of the property from Minnesota Power's rate base and a corresponding reduction in its rates. Hanna argued in the alternative that any revenues Minnesota Power derives from the transaction should be credited to ratepayers.

The Minnesota Department of Public Service ("the DPS") investigated the proposed transfer. In its report to the PUC, it recommended approving the transfer, and further recommended that the PUC defer the ratemaking treatment of the transfer until Minnesota Power's next general rate case.

On May 22, 1986, the PUC approved the transfer. It found that there was no evidence that Minnesota Power's rates were unreasonable solely as a result of the transfer. It decided to defer addressing the appropriate ratemaking treatment of the transfer until Minnesota Power's next general rate case, or until it considers Minnesota Power's proposed sale of capacity in its Clay Boswell plant to Northern States Power Company.

The PUC denied Hanna's petition for rehearing and reconsideration on July 1, 1986. Hanna then brought this appeal under Minn.Stat. § 216B.52, subd. 1 (1984).

## ISSUE

Was the PUC's decision not to reduce Minnesota Power's rates upon approving the transfer of property affected by error of law, unsupported by substantial evidence or arbitrary and capricious?

## ANALYSIS

Minn.Stat. § 14.69 (1984) provides that a reviewing court may:

affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary and capricious.

This provision applies to appeals such as this under Minn.Stat. § 216B.52, subd. 1. *See Minnesota Public Interest Research Group v. Northern States Power Co.,* 360

N.W.2d 654, 656 (Minn.Ct.App.1985). Hanna generally asserts that the PUC's decision should be reversed based on "several of these standards."

■ Agency decisions are presumptively valid, and "deference should be shown by the courts to the agency's expertise and their special knowledge in the field of their technical training, education and experience." *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977). A reviewing court must not substitute its judgment on a question the agency is authorized to decide. *Village of Goodview v. Winona Area Industrial Development Association*, 289 Minn. 378, 381, 184 N.W.2d 662, 664 (1971).

■ An agency's determination is arbitrary and capricious when it represents the agency's will rather than its judgment. *Markwardt v. State Water Resources Board*, 254 N.W.2d 371, 374 (Minn.1977). Where there is room for two opinions on the matter, the action is not arbitrary and capricious, even though the court may believe an erroneous decision was reached. *Brown v. Wells*, 288 Minn. 468, 472, 181 N.W.2d 708, 711 (1970).

The agency's factual findings are reviewed under the "substantial evidence" test. *Taylor v. Beltrami Electric Cooperative, Inc.*, 319 N.W.2d 52, 56 (1982) Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Reserve Mining*, 256 N.W.2d at 825.

Every rate made or received by a public utility must be "just and reasonable." Minn.Stat. § 216B.03 (1984). Accordingly, the PUC must fix new rates when it finds upon an investigation that rates are unreasonable;

Whenever upon an investigation made under the provisions of [this chapter], the commission shall find rates * * * to be * * * unreasonable, * * * the commission shall determine and by order fix reasonable rates * * * to be imposed * * in the future in lieu of those found to be unreasonable * * *.

Minn.Stat. § 216B.23, subd. 1 (1984).

In its order approving the transfer, the PUC gave the following reasons for its decision not to reduce simultaneously Minnesota Power's rates:

The transfer constitutes less than 0.1% of [Minnesota Power's] rate base approved in [Minnesota Power's last retail rate case]. The Commission finds that the effect of reducing the rate base to account for this transfer would have a minimal impact on rates and does not warrant the expense of a rate proceeding. In addition, the DPS concluded in its February 14, 1986 Earnings Report [on Minnesota Power's 1984 earnings] * * * that Minnesota Power would earn less than its required rate of return even with the entire Hibbard plant and other capacity excluded from rate base.

In its order denying Hanna's petition for rehearing and reconsideration, the PUC amplified the reasons for its decision:

The Commission cannot automatically order a rate reduction based on a relatively insignificant change in rate base. Under the provisions of Minn.Stat. §§ 216B.14 and 216B.23, the Commission must hold a hearing before it can order new general rates. Some significant changes which have occurred since [Minnesota Power's] last rate case include a substantial reduction in the * * * revenue that [it] is receiving from its large industrial customers and a change in the cost of equity capital. A contested hearing would be required to enable the Commission to determine the appropriate rate base, the appropriate operating income, and the appropriate rate of return before new rates could be established. Without such a hearing, the Commission has no basis upon which to conclude that the present rates are unreasonable or to order new rates.

If the Commission were to order a hearing to determine just and reasonable rates, it is possible that [Minnesota Power's] present rates could be found to be inadequate rather than unreasonably high. In the [DPS's] analysis of [Minnesota Power's] 1984 jurisdictional earn-

ings [the February 14, 1986 Earnings Report] * * *, [it] found that [Minnesota Power's] realized rate of return on equity for 1984 was 11.26% * * *. After making numerous adjustments * * * [including] the complete elimination of the Hibbard plant * * * from rate base, the DPS determined that [Minnesota Power's] realized return on equity after adjustments would have been 12.81%, compared to [Minnesota Power's] authorized return of 14.7% and a required return of 14.15%. In its adjustment to eliminate Hibbard, the DPS not only reduced the rate base by $3,776,848 but also eliminated $491,944 of related depreciation expense and $704,789 of related property taxes from operating expenses.

The Commission has calculated that, by itself, the impact of removing $644,836 [the net book value of the transferred property] from the rate base * * * would be to reduce the authorized electric revenues and rates by approximately 0.05%. If the Commission were also to eliminate an estimated amount of depreciation expense and property taxes related to the Hibbard transfer in addition to reducing the rate base, the impact of the adjustment would be to reduce the authorized electric revenue requirements by approximately 0.13% * * *. Such minimal changes in revenue requirements do not make it likely that [Minnesota Power's] rates are now unreasonable solely due to the Hibbard transfer or justify the expense of initiating a rate proceeding. * * * [T]he [DPS] will be required to submit another Earnings Report covering 1985 and projected 1986. This Report will give a fuller view of the reasonableness of [Minnesota Power's] rate level and allow the Commissioner to determine whether a hearing is warranted. The Commission finds that there is no evidence at this time which shows that [Minnesota Power's] present rates are unreasonable.

Hanna argues that the PUC acted unlawfully by approving the transfer of the property while allowing it to remain in the rate base, since the property would no longer be "used and useful." Only utility property that is "used and useful" in rendering service to the public can be included in the rate base when determining rates. *See* Minn.Stat. § 216B.16, subd. 6 (1984); *Senior Citizens Coalition v. Minnesota Public Utilities Commission,* 355 N.W.2d 295, 300 (Minn.1984). Hanna contends that whenever property that is no longer used and useful remains in a rate base, those rates are unreasonable per se.

According to Hanna, the PUC should have automatically reduced Minnesota Power's rates by simply removing the property from rate base. It argues that no hearings or further proceedings by the PUC were necessary before taking this action because § 216B.23, subd. 1, requires only an "investigation," and the PUC's investigation into whether the transfer would be in the public interest satisfies this requirement. Hanna also attacks the PUC's reliance on the DPS's February 14, 1986 earnings report, alleging that "oral representations showed it to be inaccurate and inadequate."

■ Hanna's central argument, that the transfer of the property makes Minnesota Power's rates unreasonable per se, is unsound. Determining reasonable rates involves more than determining the appropriate rate base; it also involves determining the appropriate rate of return on equity and the utility's operating expenses. *See, e.g., Hibbing Taconite Co. v. Minnesota Public Service Commission,* 302 N.W.2d 5, 10 (Minn.1980). It cannot be said that the mere transfer of any property by a utility, regardless of the amount, automatically makes its rates unreasonable, because the appropriate rate of return and its operating expenses may have increased since the rate base was last determined.

The PUC could not have simply removed the transferred property from Minnesota's rate base and reduced its rates accordingly. Minn.Stat. § 216B.23, subd. 1, requires not only a finding that current rates are unreasonable before setting new ones, but also that the new rates be reasonable. For the

PUC to act as Hanna requested would be to ignore both requirements: the record does not show that Minnesota Power's rates are unreasonable solely because of the transfer, and removing the property from its rate base would not be "determining and fixing" reasonable rates as required by the statute.

The statute also requires that Minnesota Power be accorded a hearing before the PUC changes its rates. Minn.Stat. § 216B.23, subd. 1, provides that when an investigation reveals rates to be unreasonable, new rates must be fixed by order. Minn.Stat. § 216B.14 (1984) provides that while the PUC may investigate a public utility without a hearing, "it shall make no order without affording the affected parties a hearing."

█ The PUC's reliance on the DPS's earnings report, moreover, is not grounds for reversal. First, we cannot review the accuracy of that report on this record, and this is not the proper context for such a review. This is not a proceeding to challenge the reasonableness of Minnesota Power's rates. *Compare Minnesota Public Interest Research Group*, 360 N.W.2d at 656–58. Second, the PUC's decision must be supported by substantial evidence "in view of the entire record as submitted." Minn.Stat. § 14.69(e) (1984). There is substantial evidence to support the PUC's decision not to change Minnesota Power's rates now even if the report is given little or no weight.

Finally, Hanna argued in its comments to the PUC that if the boilers remain in rate base, the revenues Hanna receives under its contracts with Duluth should be credited to ratepayers. However, Hanna cites no authority suggesting that such treatment would be appropriate, and we have found none.

## DECISION

The PUC's decision not to reduce Minnesota Power's rates by removing the transferred property from rate base upon approving the transfer was not affected by error of law, unsupported by substantial evidence or arbitrary and capricious.

Affirmed.