In the Matter of the DEREGULATION OF the INSTALLATION AND MAINTENANCE OF INSIDE WIRING, based on the Second Report and Order in FCC February 24, 1986.

In the Matter of the Petition of the RESIDENTIAL UTILITIES DIVISION OF the ATTORNEY GENERAL'S OFFICE Requesting an Investigation of Rates Charged by the Northwestern Bell Telephone Company.

No. CO–87–1768.

Court of Appeals of Minnesota.

March 8, 1988.
Review Denied May 16, 1988.

Stephen T. Refsell, Gen. Atty., Northwestern Bell Telephone Co., Minneapolis, Allan L. Grauer, Gen. Counsel, Northwestern Bell Telephone Co., Omaha, Neb., for relator Northwestern Bell Telephone.

Hubert H. Humphrey, III, Atty. Gen., Karl W. Sonneman, Sp. Asst. Atty. Gen., St. Paul, for respondent Minnesota Public Utilities Comn.

Michael J. Bradley, Sp. Asst. Atty. Gen., St. Paul, for respondent Residential Utilities Div., Office of Atty. Gen.

Christopher K. Sandberg, Sp. Asst. Atty. Gen., St. Paul, for respondent Minnesota Dept. of Public Service.

Heard, considered and decided by WOZNIAK, C.J., and FOLEY and NORTON, JJ.

## OPINION

NORTON, Judge.

This appeal involves the costs associated with the installation and maintenance of

telephone wires located within the buildings of telephone customers ("inside wiring"). Following deregulation of inside wiring by the Federal Communications Commission (FCC) in February 1986, the Minnesota Public Utilities Commission ("Commission") began proceedings to investigate the reasonableness of rates charged by Minnesota telephone companies. Determining that relator Northwestern Bell (NWB) had failed to show cause why its rates should not be reduced as a result of the deregulation, the Commission ordered a reduction in NWB's rates. We affirm.

## FACTS

Prior to January 1987, NWB and other local exchange telephone companies owned the wiring on customers' premises, and installed and maintained the inside wiring with no extra charge to telephone customers. Instead, costs necessary to cover the installation and maintenance of inside wiring were paid by customers through their monthly local telephone service bills. These costs were considered to be expenses, and were therefore among the factors taken into consideration by the Commission in setting rates in prior rate cases brought by NWB and other telephone companies.

In February 1986, the Federal Communications Commission (FCC) issued an order requiring that states such as Minnesota deregulate the installation and maintenance of inside wiring. Following the issuance of this order, the ownership of inside wiring was, practically speaking, transferred from telephone companies to their customers. Correspondingly, the responsibility for installing and maintaining inside wire was also transferred to telephone customers.

As a result of this deregulation, NWB began charging its customers additional and separate costs for installing or servicing inside wiring. At the same time, however, NWB did not lower its monthly charges to customers for local service, even though in its prior rate case, "Docket 600," in 1984, the Commission had allowed NWB to include inside wiring costs as expenses to be charged to telephone customers in their monthly local service rates.

On October 24, 1986, the Commission ordered a formal investigation into the reasonableness of NWB's general rates. This order required NWB to file financial information by April 1, 1987 regarding all of its revenues and expenses. This proceeding, "Docket 354," is a separate proceeding, unrelated to the present appeal.

In November 1986, the Department of Public Service (DPS) submitted a report to the Commission addressing several issues raised by the deregulation of inside wiring. On December 5, 1986, the Minnesota Attorney General, Residential Utilities Division, filed a petition with the Commission requesting an investigation into the effect of the deregulation on local telephone rates.

On December 31, 1986, the Commission issued an order consolidating the DPS investigation and the petition of the attorney general. This order addressed several questions involved in the deregulation of inside wiring, including the reduction of NWB's local rates as a result of the deregulation. With regard to this issue, the Commission stated:

> In its April 17, 1985 Order in *In The Matter of the Request of Northwestern Bell Telephone Company for Authority to Implement a Premises Maintenance Plan and a Trouble Isolation Charge,* [PMP] * * * the Commission observed:
>
>> In NWB, Docket No. * * * 600, the Commission considered the aggregate cost of maintaining premises wiring and, under the residual ratemaking principle followed there, allowed adequate recovery of those costs through the local exchange service rates. Now, NWB proposes to separately charge for wiring maintenance. *Since its costs are already accounted for in the local exchange service rates,* the gross revenue effect of the PMP proposal represents an increase in revenues over costs to NWB. Looked at otherwise, *NWB will have double recovery for wiring maintenance costs through both its local exchange service rates and the proposed PMP*

*rates.* The Commission concludes that such a double recovery is unjust and unreasonable.

(Emphasis in original.) The Commission recognized that other changes in NWB's costs may have taken place to offset this reduction in costs covered by the local service rate, but concluded that without a general review of the company's rates the Commission had no way of discovering what those other costs might be. The Commission therefore concluded:

> Unless and until the telephone company presents evidence to the contrary, the Commission will direct that basic service rates be lowered to account for the removal of inside wire and riser cable maintenance expense and the removal of house riser cable from rate base.

The Commission placed the burden of disproving this analysis upon the local exchange telephone companies, ordering each telephone company to file a report showing the actual amount of its inside wiring expenses in 1986 and a proposal for adjusting its rates to reflect the deregulation of inside wiring. The Commission ordered each telephone company to make this filing by February 13, 1987, or show good cause why its local rates should not be reduced as a result of the deregulation.

NWB filed a motion for reconsideration of the Commission's December 31 order, challenging the Commission's authority to lower rates by means of an order to show cause, rather than a general contested rate case, and claiming that the Commission's order was arbitrary and capricious and not based upon substantial evidence in the record.

On February 20, 1987, the Commission issued an order denying NWB's motion for reconsideration and clarifying its December 31 order. The Commission first determined that it possessed the authority to proceed by a show cause order. Regarding NWB's claim that the show cause order was arbitrary and capricious and based upon insufficient evidence, the Commission again cited its premises maintenance plan order, cited above; the FCC order deregulating inside wiring; and a letter from NWB to the Commission advising the Commission that its installation and maintenance charges for wiring would be detariffed after January 1, 1987. The Commission concluded that such evidence "conclusively demonstrates that NWB's current rates, as of January 1, 1987, recover expenses for services no longer regulated and no longer performed by NWB without separate additional charge."

The Commission also reasoned that it could have characterized the situation simply as an "unbundling" of the services provided through NWB's local service rates. The Commission explained:

> Prior to January 1, 1987, NWB's local service rates provided both inside wire maintenance service and local dial tone service. The charge for multiple services was "bundled" into a single local service rate. After January 1, 1987, when one of these services was deregulated, it became necessary to "unbundle" the local service rate and separately identify the charge for the wiring service being deregulated to insure fair and reasonable rates. * * * NWB does not face a rate reduction as a result of this proceeding, but will simply collect the current rate in a different manner with the rate elements for inside wire maintenance and for other services separated at the conclusion of this proceeding.

Finally, the Commission noted that, while NWB had the burden of proving its rates reasonable, it "need only come forward with evidence to support the reasonableness of its present rates and proceed to a hearing if facts are in dispute that would make a hearing necessary." The Commission noted that even if NWB could not obtain all of the information necessary by the February 13 deadline, it could submit evidence sufficient to demonstrate cause why it could not comply with the deadline, and could request an extension.

In response to the show cause order and clarifying order, NWB filed rates and tariffs on June 26, 1987, which demonstrated a $5.2 million reduction in expenses due to the deregulation of inside wiring.

Filings were also submitted by other local exchange telephone companies, and the DPS reviewed all filings and issued its report to the Commission on June 26, 1987. On June 30, 1987, the Commission issued a notice providing an opportunity for all telephone companies to make written comments regarding the DPS report or to make oral comments at a July 7, 1987 meeting. Various telephone companies, including NWB, did make written and oral comments.

On August 11, 1987, the Commission issued its final Order Requiring Rate Reduction, which is the subject of this appeal. Again, the Commission found that it had the authority to proceed by the show cause order, instead of addressing each individual telephone company's rates in a separate rate proceeding. The Commission concluded that NWB's existing rates were unreasonable, and that NWB did not provide sufficient evidence demonstrating the reasonableness of its current rates, in view of the deregulation of inside wiring. The Commission expressed the following reasons for its decision:

(1) The fact that in Docket 600 the MPUC had established NWB's rates to customers based in part upon the expenses of installing and maintaining inside wiring;

(2) The fact that the FCC order had deregulated inside wiring;

(3) The fact that the costs of installing and maintaining inside wiring after deregulation would no longer be incurred by NWB;

(4) The fact that the premises maintenance plan (PMP) order indicated that if NWB were allowed to recover expenses for inside wiring within its local service rates and also as a separate charge to customers, NWB would receive a double recovery;

(5) The fact that, by letter dated November 4, 1986, NWB had advised the MPUC that installation and maintenance charges for wiring would be detariffed after January 1, 1987;

(6) The fact that NWB's June 26, 1987 compliance filing acknowledged a $5.2 million revenue requirement reduction as a direct consequence of deregulation of inside wiring;

(7) The fact that the show cause proceeding could be viewed as merely an "unbundling" of NWB's rates, rather than an actual reduction in rates;

(8) The fact that NWB did not provide sufficient proof that its current rates were reasonable, despite the fact that NWB had the burden of proof, and had been given sufficient time to present evidence of possible increases in costs which might have offset the decrease in costs due to the deregulation of inside wiring.

## ISSUES

1. Did the Commission have the authority to order NWB to reduce its rates based upon a decrease in one expense and following a show cause order, instead of a contested case hearing?

2. Was the Commission's order arbitrary and capricious and unsupported by substantial evidence in the record?

3. Could the Commission reduce NWB's rates pursuant to a show cause procedure without following the formal rulemaking requirements of the Minnesota Administrative Procedures Act?

## ANALYSIS

### Scope of Review

The Minnesota Supreme Court has recently explained the scope of this court's review on appeal from determinations by the Commission:

As an administrative agency, the MPUC may exercise two different functions: a quasi-judicial function and a legislative function. See Minn.Stat. § 216A.05, subd. 1 (1986). When the MPUC engages in a quasi-judicial function, a reviewing court applies the "substantial evidence" test * * * but when the MPUC is engaged in a legislative function, on review the decision will be upheld if the agency acted within its statutory authority, and the result was not unjust, unreasonable, or discriminatory, as shown by clear and convincing evidence.

*In the Matter of the Petition of Northern States Power Co. for Authority to Change its Schedule of Rates for Electric Service in Minnesota,* 416 N.W.2d 719, 723 (Minn. 1987) (citations omitted).

NWB's claim regarding the Commission's authority to alter rates by means of a show cause order involves the Commission's legislative function; i.e., whether or not the Commission acted within its statutory authority. NWB's claim that the Commission should have promulgated rules to implement its show cause order, likewise involves the question whether the Commission properly exercised its legislative function. NWB's claim that the Commission's order was arbitrary and capricious and unsupported by substantial evidence, however, must be reviewed under the substantial evidence test.

1. NWB claims that the Commission had no authority to change its rates by means of an investigation and show cause order, instead of conducting a contested case hearing. We first note that NWB at no time actually requested a contested case hearing.

NWB's claim turns upon the Commission's authority under its enabling statutes, and the Commission's interpretation of those statutes. When determining whether or not an administrative agency has acted within its statutory authority, the agency's interpretation of its own statutes deserves some deference, in view of the agency's expertise and special knowledge in the field of its technical training, education, and experience. *See Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977). However, where the statutory language is not exceedingly technical, or where the question before the court is one which the agency has not previously considered, the court need not place much weight on the agency's interpretation. *See Minnesota Microwave, Inc. v. Public Service Commission,* 291 Minn. 241, 245, 190 N.W.2d 661, 665 (1971).

Here, we agree with the Commission that the provisions of chapter 237, when viewed as a whole, authorize the Commission's investigation, show cause or-

der, and final order reducing NWB's rates. Minn.Stat. § 237.081 (1986), entitled "Summary Investigations of Inadequate Service," provides:

Subdivision 1. Whenever the commission shall believe that any service is inadequate or cannot be obtained or that an investigation of any matter relating to any telephone service should for any reason be made, it may on its own motion summarily investigate the same with or without notice.

\*   \*   \*   \*   \*   \*

Subd. 2. If, after making such summary investigation, the commission becomes satisfied that sufficient grounds exist to warrant a formal hearing being ordered as to the matters investigated, it shall set a time and place for a hearing.

\*   \*   \*   \*   \*   \*

Subd. 4. Whenever the commission shall find that any service which can be reasonably demanded cannot be obtained, or that any of the rates, tolls, tariffs, charges or schedules or any regulation, measurement, practice, act or omission affecting or relating to the production, transmission, delivery or furnishing of telephone service or any service in connection therewith is in any respect unreasonable, insufficient or unjustly indiscriminatory, or that any service is inadequate, the commission shall make an order respecting the rates, tolls, tariffs, regulation, act, omission, practice or service that is just and reasonable.

This language indicates that the investigation by the Commission was proper.

While subdivision 2 indicates that a "formal" hearing may be required, this language does not necessitate a contested case hearing. Rather, where the legislature has indicated that a contested case hearing is required, the legislature has so stated. In Minn.Stat. § 237.075, governing requested rate changes by a telephone company, for instance, the legislature has specifically indicated that where significant issues have not been resolved to the Commission's satisfaction, a contested case hearing must be held. Since the legislature did not similarly

require a contested case hearing within Minn.Stat. § 237.081, we may assume that a contested case hearing is not required in the case of a summary investigation by the Commission.

Minn.Stat. § 237.02, states that the Commission is vested with the same authority over telephone companies as it has over railroad and express companies. Minn. Stat. § 216.14 (1986), governing railroads, indicates that upon the filing of a complaint, "if there appear reasonable grounds for investigating such matter, the commission shall issue an order directed to and requiring such carrier or warehouse operator to grant the relief demanded or *show cause* * * * why such relief should not be granted." (Emphasis supplied.) Should the petition by the attorney general be viewed as a complaint, chapter 216 provides additional authority for the Commission's issuance of a show cause order in this matter.

NWB points to language by the Commission in other cases, which NWB claims indicates that the Commission should have conducted a contested case hearing in this matter. For example, NWB points to the following language by the Commission in Docket 354:

> Essentially, if a utility objects to a lower rate as confiscatory or not justified by facts, the commission cannot avoid a contested case hearing.

As the respondent Commission notes, Docket 354 involves a complicated review of NWB's overall rates, including an investigation into its rate base and rate of return. In such case, it is understandable that the Commission would wish to conduct a contested case hearing, since rate base and rate of return matters involve detailed calculations and the weighing of expert testimony. Here, on the other hand, the determination of NWB's reduced expenses due to deregulation of inside wiring is a comparatively easy task, and NWB has admitted that the reduction amounts to $5.2 million.

NWB also points to the Commission's language in the premises maintenance plan case, where the Commission refused to consider NWB's new plan until the next general rate case:

> At that time the Commission would have before it both the revenue and costs of all services and would be able to match these better within the constraint of the Company's overall revenue requirements.

First, this language does not indicate whether or not the Commission has the authority to determine whether NWB's rates should be reduced without a contested case hearing; rather, the language merely indicates the Commission's determination that it would be wiser to determine the issue within a larger rate context. Further, the facts in the premises maintenance plan case are distinguishable from those in the present case. In the premises maintenance plan case, which occurred prior to the deregulation of inside wiring, NWB had requested that it be allowed to impose an additional charge on its customers for repair and maintenance of inside wiring, without reducing its expenses charged to those same consumers within its local service rates. The Commission refused to impose a double charge, determining that it would be better to consider both charges in one rate proceeding. Here, on the other hand, after deregulation occurred, the Commission itself determined that NWB's charges for expenses which were no longer incurred should be reduced. Both procedurally and factually, this case is distinguishable from the premises maintenance plan case.

NWB also cites this court's decision in *In the Matter of Minnesota Power's Transfer of M.L. Hibbard Units 3 and 4 Boilers and Related Facilities To The City of Duluth*, 399 N.W.2d 147 (Minn.Ct.App.1987), (*MPT*) in support of its argument that the Commission should have determined NWB's reduction in expenses within the context of a general rate proceeding, rather than by means of its show cause proceeding. In *MPT*, this court affirmed the Commission's decision to consider a company's elimination of certain rate base property within the context of a general rate proceeding, rather than in a single issue proceeding.

There are at least three reasons to distinguish *MPT* from the present case. First, *MPT* involved the public utilities act, chapter 216B, rather than the telephone statutes, chapter 237. Under the public utilities act, the Commission *must* hold a hearing before issuing any order during an investigation. Here, the Commission has the discretion to conduct a formal hearing.

Second, the transfer of property from the company's rate base in *MPT* involved considerations of the appropriate rate base, operating income and rate of return. Here, on the other hand, only one issue—NWB's operating expense—is involved.

Third, the Commission in *MPT* had found that the rate base property at issue constituted less than 0.1% of Minnesota Power's rate base, which would have a "minimum impact on rates." Here, on the other hand, NWB's revenue requirements were reduced by $5.2 million as a result of the deregulation of inside wiring. We therefore conclude that *MPT* is distinguishable.

NWB also claims that the Commission may not change its rates based upon only one expense, since Minn.Stat. § 237.075 requires the Commission's consideration of additional factors.

Minn.Stat. § 237.075 deals in general with rate changes requested by telephone companies. Each of the provisions within Minn.Stat. § 237.075 governs procedures for changing rates when requested by a telephone company. Thus, the factors cited by NWB within Minn.Stat. § 237.075 concern the evidence the Commission must consider when reviewing a general rate case brought by a telephone company.

On the other hand, the present case involves an investigation commenced by the Commission. This is a separate type of procedure, as indicated by the title of section 237.081—Summary Investigations of Inadequate Service. Language in section 237.075 itself also indicates that an investigation commenced by the Commission is a different type of proceeding:

> Unless the commission otherwise orders, no telephone company shall change

a rate which has been duly established under this chapter * * *.

Minn.Stat. § 237.075, subd. 1 (1986).

Further evidence of the legislature's intent that the provisions of Minn.Stat. § 237.075 should only govern rate cases brought by telephone companies and not investigations by the Commission itself may be found in the legislature's discussion of the burden of proof. Within Minn.Stat. § 237.075, the legislature has indicated that the burden of proof to show a rate change is just and reasonable shall be upon the telephone company seeking the change. Minn.Stat. § 237.075, subd. 4. In a separate provision, the legislature sets forth the burden of proof in proceedings such as the present:

> In any investigation, action or proceeding arising under, or growing out of, an action initiated by the commission upon its own motion, the burden of proof shall be upon the telephone company to establish the reasonableness of the existing rates.

Minn.Stat. § 237.28 (1986).

Overall, therefore, the provisions of chapter 237 provide for two separate procedures: a rate case brought by a telephone company pursuant to Minn.Stat. § 237.075, and an investigation by the Commission pursuant to section 237.081. The procedures and factors to be considered in each of those proceedings differ, the burden of proof is separately stated, and the hearings required are different. We therefore conclude that the Commission's actions in this case in conducting an investigation, issuing an order to show cause, and promulgating a final order reducing NWB's rates were authorized by the provisions of chapter 237.

■ 2. NWB also argues that the Commission's August 11, 1987 order was arbitrary and capricious and unsupported by substantial evidence in the record. In *Reserve Mining*, the supreme court defined "substantial evidence" in terms of what a reviewing court must look for on appeal. The court defined "substantial evidence" as:

(1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than 'some evidence'; (4) more than 'any evidence'; and (5) evidence considered in its entirety.

*Reserve Mining,* 256 N.W.2d at 825.

NWB notes that in Docket 600, the Commission had determined that NWB's rates were just and reasonable. NWB points to Minn.Stat. § 237.075 which states that once a telephone company's rates have been set, they "shall thereafter be observed until changed, as provided by this chapter." *Id.,* subd. 5. Again, however, section 237.075 deals with changes requested by telephone companies, and does not govern the procedures commenced by the Commission here.

NWB also cites *State v. Tri–State Telephone & Telegraph Co.,* 204 Minn. 516, 284 N.W. 294 (1939), as standing for the proposition that rates set by the Commission should be presumed just and reasonable until "the contrary is shown by clear and convincing evidence." Subsequent to the Commission's decision in the *Tri–State* case, however, the Minnesota legislature enacted Minn.Stat. § 237.28, which states that in an investigation commenced by the Commission, a telephone company has the burden of proving its rates are reasonable. Clearly, therefore, during the proceedings in this matter, NWB had the burden of proving its rates reasonable, and the Commission did not have the burden of proving otherwise.

NWB claims that the Commission erroneously presumed its rates were unreasonable. The record, however, reveals that the Commission carefully considered NWB's prior rates, the deregulation order, and the evidence submitted by NWB, before arriving at its determination that NWB's rates were no longer reasonable. While NWB did submit conclusory affidavits, the Commission found that NWB had produced no probative evidence supporting its claim that the $5.2 million reduction in expenses due to deregulation of inside wiring was offset by other increases in expenses.

The Commission rejected NWB's argument that local rates should not have been lowered because local rates presently constitute only approximately one-half of the cost of service calculated by the company. Citing several cases, the Commission found that it had rejected NWB's cost studies and arguments on this claim in the past. The Commission stated:

Local exchange service rates were properly set in past rate cases to recover the Company's residual embedded cost of service. Competing claims that these rates are greater than or less than studies purporting to show the incremental cost of service have been accorded little, if any, weight. Since the cost savings for the removal of inside wire have been determined in the same manner as the costs upon which the existing local exchange service rates were based, a rate reduction to remove these costs is reasonable.

We believe that this reasoning sufficiently addresses NWB's claim on appeal that the Commission's establishment of rates on a residual basis results in recovery by NWB of only approximately one-half of its actual service costs.

The Commission also rejected NWB's argument that a final determination of the reasonableness of its rates should await the completion of the record in Docket 354. Referring to Docket 354 as the "DOD" case, the Commission stated:

The DOD case does not constitute grounds to delay action here because NWB will continue collecting rates without the benefit of refunds while the DOD case is being investigated. NWB's rate payers will not receive the appropriate relief from unreasonable rates until that docket is complete. The DOD case is not based upon known and measurable changes in cost, but upon inferences and more general evidence of economic conditions that led the commission to find that an investigation of NWB's rates was necessary. NWB's rate payers should not have to wait for that investigation to receive relief for the known cost changes found here. Further, it would be unfair for NWB's rate payers to continue to pay

higher bundled rates when the evidence demonstrates that the unbundled rate that reflects present service is known.

We agree with this reasoning, and reject NWB's argument that the Commission should have incorporated by reference the evidence presented in Docket 354.

3. NWB claims the Commission erred by creating a "new show cause rate reduction procedure" without following the formal rulemaking procedures of the Minnesota Administrative Procedures Act (APA). However, even if the show cause procedure has not been followed in the past, NWB's claim that the Commission should have promulgated rules is not persuasive. Rather than creating new procedures, we believe the Commission was simply following the procedures set forth in the statute.

The respondent Commission states in its brief that for more than ten years it has believed its investigative authority includes the show cause procedure. The Commission points to *Northern Natural Gas Co. v. Minnesota Public Service Commission*, 292 N.W.2d 759 (Minn.1980), where the supreme court accepted a similar procedure without question.[1] Further, the Commission claims that in the past the Commission has often practiced "single issue rate making" with the acquiescence of NWB. In fact, it appears that the Commission maintains an entire docket number system known as "miscellaneous dockets" for such changes.

### DECISION

The procedures followed by the Commission were proper. The reduction in NWB's rates as a result of the deregulation of inside wiring is supported by substantial evidence in the record.

Affirmed.

---

1. While the *Northern Natural Gas* case dealt with gas and electric companies, rather than telephone companies, the statutory provisions are similar; neither chapter provides expressly for a show cause order. One difference between the statutes, however, is that the gas and electric statutes do not allow the Commission to make any order in an investigation without conducting a hearing.